



**SIGNED this 19 day of May, 2011.**

_____
**Shelley D. Rucker**
**UNITED STATES BANKRUPTCY JUDGE**
_____

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION

In re:                                              No. 09-16854
                                                    Chapter 7 Debtor
LORETTA J. HART,

            Debtor;


SOUTHERN HERITAGE BANK

            Plaintiff,

v                                                    Adversary Proceeding
                                                     No. 10-1304

LORETTA J. HART,

            Defendant.

**Memorandum**

In this adversary proceeding Plaintiff Southern Heritage Bank (the "Bank" or "Plaintiff")

alleges that the Debtor Loretta J. Hart, formerly Loretta Hart Scheib, provided materially false

statements to the Bank that were intended to deceive the Bank and induce it to make various

loans to the Debtor.  [Doc. No. 1, Complaint].[1]  The Bank brings a claim against the Debtor

pursuant to 11 U.S.C. § 523(a)(2)(B) and seeks a determination from this court that the Debtor's

indebtedness to the Bank is non-dischargeable.

Having considered the entire record in the case, including the evidence presented by the

parties at the hearing and the arguments of counsel, the court makes the following findings of

fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

I.      **Findings of Fact**

The Debtor filed her Chapter 11 bankruptcy petition on October 22, 2009.  *See* [Doc. No.

1, Bankr. Case No. 1:09-bk-16854].  This court converted the case to one under Chapter 7 on

November 5, 2009.  [Doc. No. 21, Bankr. Case No. 1:09-bk-16854].

The Plaintiff is a creditor of the Debtor who provided loans to Daisy Properties, LLC

("Daisy"), Optimum Staffing, Inc. ("Optimum"), and the Debtor.  Debtor was a member of Daisy,

along with her former husband, Jerry Scheib.  The Debtor's relationship to Optimum is not so

clear and is central to this dispute.  The loans are summarized below:

(a) *Optimum Loan.*  Loan number 9067566 was made to Optimum on May 25, 2005. The

original principal amount was $1,175,000.00.  The Debtor guaranteed the loan on June 30,

2006. The loan is evidenced by a promissory note dated May 28, 2007.  The current balance is

$953,375.96.  Trial Exhibits 15 and 28.  The purpose of this loan was to back a letter of credit

that was issued to AIG for workers compensation insurance.  The letter of credit was eventually

---

[1]     All citations to the court's docket entries are for the docket pertaining to Adversary
Proceeding 10-1304, unless otherwise noted.

called on May 25, 2008, and the loan was fully funded.  Trial Testimony of Carol Killen, April 6,

2011 at 10:40 - 10:42 a.m.; Proof of Claim 14-1, Trial Exhibit 15.  Following that letter being

called and the loss of customers in 2007 and 2008, Optimum began experiencing financial

difficulties and filed a Chapter 7 bankruptcy petition, Case No. 09-15008, on August 10, 2009.

The Bank has liquidated all of the assets of Optimum which secured this and other loans from

the Bank to Optimum which have been paid, including a factoring facility.  Trial Testimony of

Carol Killen, April 6, 2011 at 10:49 - 10:52 a.m.

        Prior to the hearing the Bank filed a motion in limine regarding the Debtor's ability to

raise counterclaims or setoffs of Optimum as a defense to the amount owed by the Debtor as a

guarantor of the Optimum Loan.  The court ruled that she could not present evidence of

Optimum's claims because she had failed to raise them previously; however, the court also

ruled that the court's decision on this motion was not intended to be a ruling on the merits of

those claims.  To the extent that Optimum successfully maintains a defense or counterclaim

which reduces its debt, the Debtor's guaranty obligation would be accordingly reduced.

        (b) *Personal loan.*  Loan number 9066772 was made to the Debtor on April 26, 2005.

The original principal amount was $100,150.00.  It was renewed, and that renewal was

evidenced by a promissory note dated June 30, 2006.  The current balance is $12,765.66.  Trial

Exhibits 16 and 28.

        (c) *Daisy Loan.*  Loan number 9077898 was made to Daisy, the Debtor and Jerry Scheib

on May 11, 2006.  The original principal amount was $535,267.46.  The loan was renewed and

is now evidenced by a modification agreement dated May 11, 2007.  The current balance is

$177,208.  Numerous tracts of real property on which the bank has foreclosed secured the loan.

Trial Exhibits 17 and 28.

        (d) *Residence Loan.*  Loan number 9091157 was made to the Debtor on September 7,

2007.  The original principal amount was $574,410.00.  The loan is evidenced by a promissory

note dated September 7, 2007, and was secured by her personal residence.  The Bank has

foreclosed on the residence, and the current balance is $145,151.33.  Trial Exhibits 18 and 28.

There were several other credit facilities which the Bank had with Ms. Hart or with

parties affiliated with Ms. Hart.  Credit Authorization, Trial Exhibit 22 at 2-3.  One of these was a

factoring arrangement for Optimum referred to as the "Business Line."  The "Business Line" and

all of the other loans owed directly or guarantied by Ms. Hart have been satisfied except for the

four loans.

Ms. Carol Killen, a senior credit officer of the Bank testified regarding the Bank's

procedure in making a loan.  She testified that the Bank examined the income of the prospective

borrower, its debt load, and when available, compared the borrower operations to those of other

similar industries.  This information was obtained from the financial information provided by the

prospective borrower.  A credit approval form was prepared and loan approval was requested.

The Bank would look first to the assets of the borrower and then to the guarantors as secondary

support for the loan.  Tax returns were requested and compared to the income on the financial

statements.  Neither Ms. Killen nor Mr. Stewart recalled doing any investigation into the

corporate ownership of Optimum or checking on the company's corporate existence.

During her banking relationship with the Bank, the Debtor furnished the Bank with eight

written financial statements.  Trial Exhibits 3 through 10.  For its objection to dischargeability,

the Bank is relying on one misrepresentation in these statements - the representation that the

Debtor owned Optimum when in reality all of the stock of that business was owned by another.

The Bank defines ownership as stock ownership.  The Debtor would have the court find that

complete control of the business assets equates to ownership in this situation.  If the court were

to agree with the Debtor's interpretation then there would be no misrepresentation on which the

Bank could rely.

The first financial statement presented to the Bank in September of 2002 ("9/02

Statement") was signed by the Debtor and her husband at the time, Jerry Scheib.  Mr. Scheib

owned a temporary staffing company by the name of ASK.  Trial Testimony of Loretta Hart, April

6, 2011 at 3:24 p.m.  The 9/02 Statement had a line item designated as "Business."  The

business referred to at that time was ASK.  There is no dispute that Mr. Scheib was the

stockholder of ASK.  That company closed in November of 2002.

In 2002, Mr. Scheib and Ms. Hart began operating Optimum which was also a temporary

staffing company.  In the next four financial statements provided to the Bank, at the same place

on the financial statement, the item "Business" appeared.  November 12, 2003 Financial

Statement of Mr. Scheib and Ms. Hart, Trial Exhibit 4 at 1 ("11/03 Statement"); October 25, 2004

Financial Statement of Mr. Scheib and Ms. Hart, Trial Exhibit 5 at 1[2] ("10/04 Statement"); April 5,

2006 Financial Statement of Mr. Scheib and Ms. Hart, Trial Exhibit 6 at 1 ("4/06 Statement");

November 27, 2006 Financial Statement of Mr. Scheib and Ms. Hart, Trial Exhibit 7 at 1 ("11/06

Statement").  Two pages later in each statement there is a section entitled "Other Assets" in

which Optimum is the first asset specifically identified and its sales figures and a value are

detailed.  The number in each of these financial statements given for the value of Optimum

corresponds to the value for the "Business" which appears on the first page of each financial

statement.

From the proof presented at trial, neither the Debtor nor her former husband ever owned

any stock of Optimum. The actual ownership is somewhat confused. The stock was held by

either John Konvalinka as Trustee with Rebecca Wood as the beneficiary or owned by Rebecca

Wood outright.  Statement of Financial Affairs for Loretta J. Hart, Trial Exhibit 2 at 10, Question

[2] The Debtor questioned whether her signature appeared on this financial statement in her deposition which was admitted at trial.  2004 Examination of Loretta Hart, Trial Exhibit 14 at 122.  Debtor did not dispute her signature on this financial statement or any other financial statement at trial.  The court will therefore treat all of the financial statements as issued by the Debtor either directly as evidenced by her signature or indirectly by her husband as her agent.

21.b.  There was no proof that Ms. Wood or Mr. Konvalinka ever exercised any control over Optimum or its operations.  The Debtor testified that she set up the corporation in this way because ASK had experienced a lot of problems, including her former husband's inappropriate relationship with an ASK employee, and the Debtor "didn't trust her husband."  Trial Testimony of Loretta Hart, April 6, 2011 at 3:05 p.m.  She further testified that when it came time to "shut down ASK" "the only way I was going to be involved . . . was that the stock be put into Rebecca's name because she was my niece, there was ten years difference from us, and she was like a daughter to me, and I trusted her with anything. . . ."  *Id.* at 3:05 p.m. through 3:06 p.m.

No stock certificate, no trust agreement or any other evidence was presented other than the Debtor's testimony about what rights Ms. Wood had or had ceded to the Debtor.  There was no evidence presented that Ms. Wood as the sole shareholder had by agreement limited the usual authority that a sole shareholder has (i) to fire the Debtor and appoint a new officer to operate the company, (ii) to sell the company and take any equity for herself, or (iii) to transfer all or a part of the stock to another person.

Beginning with the February 28, 2007 Financial Statement ("2/07 Statement"), the Attachment no longer included the detail for Optimum's operations, although the line item for "Business" continued to appear.  2/07 Statement, Trial Exhibit 8 at 1.  The same format was used in the August 10, 2007 Financial Statement ("8/07 Statement").  8/07 Statement, Trial Exhibit 9 at 1.  The value of the "Business" is shown as $10,200,000 with debt against it of $1,369,143.  *Id.*  The last statement furnished to the Bank is signed only by the Debtor.  January 22, 2008 Financial Statement ("1/08 Statement"), Trial Exhibit 10 at 1.  In December of 2007, the Debtor divorced Mr. Scheib and was awarded the business.  Divorce Decree, Trial Exhibit 21.  The 1/08 Statement valued Optimum at $12,000,000 although there were no sales figures or value detail provided in the attached "Other Assets" section.  Trial Exhibit 10 at 2.  In all of the

last seven financial statements, the section of detail entitled "stocks" shows only stock in the Bank.  No shares of Optimum are ever listed.

The Debtor also provided tax returns to the Bank during the period of 2006 through 2008.  On September 8, 2006, the Bank received the 2002 return for Optimum.  In Schedule E, the Debtor is shown as an officer and the ownership of the company is left blank.  She is shown as spending only 50% of her time working for Optimum.  2002 Tax Return for Optimum, Trial Exhibit 11 at 2.  Optimum reported $816,631 in other income.  *Id.*  The 2006 Tax Return for Optimum was delivered to the Bank on September 23, 2008.  2006 Tax Return for Optimum Staffing, Trial Exhibit 12 at 1.  Schedule E reflects that the Debtor was an officer who devoted 100% of her time to Optimum.  The section for stock ownership was again left blank.  *Id.* at 3.  Income is shown at $37,616,315.  The 2007 return was delivered to the Bank on November 20, 2008.  2007 Tax Return for Optimum, Trial Exhibit 13.  This time Ms. Wood's name appears as the 100% owner and the Debtor is shown as the CEO.  *Id.* at 2.  The company's income is listed as $32,003,043.

Mr. Stewart, the president of the Bank, testified that the Bank relied on the Financial Statements to decide whether to make or to renew the four loans which still have balances outstanding.  He testified that it was the Bank's policy to require the guaranty of owners of a closely held company.  Bank Lending Policy, Trial Exhibit 27 at 2.  He said, in the Debtor's case, the value of Optimum was a large portion of the Debtor's net worth and the sole source of her substantial income.  He would not have approved the loans had she and her husband not been the owners.  He explained that he would have been concerned that she could have been removed as an officer or the company sold without her permission if she were not the owner.  Trial Testimony of J. Lee Stewart, April 6, 2011 at 2:09 - 2:11 p.m.  When questioned about why he did not take a stock pledge of the company if it were so important to the Bank, he responded, "the loans were to Optimum Staffing, the assets of which were either pledged to us or others, . .

. the value of the stock of the company, per se, as a liquidatable [sic] value is, is almost meaningless.  It's not common to take the pledge of the stock of the company you're lending to." Trial Testimony of J. Lee Stewart, April 6, 2011 at 2:23 - 2:24 p.m.

From the rebuttal testimony of the Credit Officer Ms. Killen and the rebuttal witnesses Ms. Gayle Ellis and Mr. Steve Ledbetter, it does not appear that anyone at the Bank required the articles of incorporation or the stock certificates to be presented to the Bank as part of the Bank's due diligence.  Ms. Ellis testified that she checked the secretary of state's website to confirm that Optimum was in good standing, and Mr. Ledbetter testified that it was the Bank's policy to conduct such an investigation.  Trial Testimony of Gayle Ellis, April 6, 2011 at 3:52 - 3:54 p.m.; Trial Testimony of Steve Ledbetter, April 6, 2011 at 4:04 - 4:05 p.m.

The Financial Statements reflect the Debtor's income, the value of the Business and the Debtor's total net worth. The chart below calculates the percentage of the net worth that the Business represented and her income from the Business.[3]

| Financial Statement | Business Value | Total Net Worth | Business % of Total NW | Scheibe Optimum Salary | Hart Optimum Salary |
|---|---|---|---|---|---|
| 9/02 | 970,000 | 1,776,403 | 54.60% | N/A | N/A |
| 11/03 | 1,100,000 | 2,098,097 | 52.43% | 72,800 | 72,800 |
| 10/04 | 3,200,000 | 4,878,333 | 65.60% | 116,200 | 116,200 |
| 4/06 | 6,000,000 | 8,593,661 | 69.82% | 282,579 | 482,373 |
| 11/06 | 9,500,000 | 13,311,068 | 71.37% | 282,579 | 482,373 |
| 2/07 | 9,500,000 | 12,534,577 | 75.79% | 482,289 | 632,704 |
| 8/07 | 10,200,000 | 12,627,070 | 80.78% | 428,289 | 632,704 |
| 1/08 | 12,000,000 | 15,566,929 | 77.09% | 0 | 632,704 |

---

[3] The court has calculated the percentage of the Debtor's net worth represented by the Business by taking the value of the Business in line 1 and dividing that by the number shown for net worth which includes furniture and jewelry on the financial statements.

The Debtor testified to only one specific occasion when she recalled discussing the ownership of Optimum with the Bank.  Following her divorce in the summer of 2008, she discussed the fact that she had never put any ownership interest in the company into her ex-husband's name and that she had put it all in trust.  She recalls Mr. Stewart commenting that it was a good thing.  Mr. Stewart testified that he had no recollection of the conversation. The Debtor testified that she believed that the bank was aware of her ownership interest; however, Ms. Ellis and Ms. Killen both testified that the first that they learned of Ms. Woods ownership was when the 2007 tax return was delivered in November of 2008.

## II.    Jurisdiction

28 U.S.C. §§ 157 and 1334, as well as the general order of reference entered in this district provide this court with jurisdiction to hear and decide this adversary proceeding.  The Plaintiff's action regarding the dischargeability of particular debts is a core proceeding.  *See* 28 U.S.C. § 157(b)(2)(I) and (J).

## III.    Analysis

11 U.S.C. § 727 provides for discharge from debt unless excepted from discharge pursuant to 11 U.S.C. § 523.  11 U.S.C. § 727(a)-(b).  11 U.S.C. §§ 523(a)(2)(B) states in relevant part:

> (a)  A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt – . . .
>
> > (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by –  . . . .
> >
> > (B) use of a statement in writing –
> > (i) that is materially false;
> > (ii) respecting the debtor's or an insider's financial condition;
> > (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
> > (iv) that the debtor caused to be made or published with intent to deceive; . . .

11 U.S.C. §§ 523(a)(2)(B).  The creditor must prove by a preponderance of the evidence that a

debt is non-dischargeable under 11 U.S.C. § 523.  *See Grogan v. Garner*, 498 U.S. 279, 287,

111 S.Ct. 654, 659 (1991).  Exceptions to discharge are narrowly construed in the debtor's

favor.  *See Monsanto Co. v. Trantham (In re Trantham)*, 304 B.R. 298, 306 (B.A.P. 6th Cir.

2004).

Whether a debt is dischargeable pursuant to 11 U.S.C. § 523(a)(2)(B) is determined by

analyzing federal law.  *See e.g., Call Federal Credit Union v. Sweeney (In re Sweeney)*, 264

B.R. 866, 870 (Bankr. W.D. Ky. 2001).  As a bankruptcy court in this district explained:

> [i]n summary, a determination of nondischargeability under § 523(a)(2)(B)
> requires proof that the Plaintiff loaned money after it reasonably relied upon false
> financial documents concerning the Defendant and/or an insider which were
> provided by the Defendant either directly or indirectly, and that the Defendant
> intended to deceive the Plaintiff when doing so, and unless all of the statutory
> criteria are satisfied, the debt will be discharged.

*Regions Bank v. Whisnant (In re Whisnant)*, 411 B.R. 559, 563 (Bankr. E.D. Tenn. 2009).

### A.      The Requirement of a Written Statement

To demonstrate a claim pursuant to 11 U.S.C. § 523(a)(2)(B) the Plaintiff must

demonstrate a statement made in writing.  This requirement may be fulfilled by providing a

written statement that was "'signed, adopted or used by the debtor.'" *Haney v. Copeland (In re

Copeland)*, 291 B.R. 740, 781 (Bankr. E.D. Tenn. 2003) (quoting *Insouth Bank v. Michael (In re

Michael)*, 265 B.R. 593, 598 (Bankr. W.D. Tenn. 2001)).  A statement does not have to be

prepared by the defendant to satisfy the written statement requirement; however, she "must

have either created it, had it created, or allowed it to be 'published' by making it public or

circulating it."  *In re Whisnant*, 411 B.R. at 564-65.  Further, "a written statement respecting a

debtor's financial condition may be described as one representing the debtor's net worth, overall

financial health, or ability to generate income so as to enable an accurate assessment to be

made of the debtor's creditworthiness."  *Midwest Comm. Fed'l Credit Union v. Sharp (In re

Sharp)*, 357 B.R. 760, 765 (Bankr. N.D. Ohio 2007).  Such statements may include loan

applications.  *Id.*  Moreover, the statement does not need to be a formal financial statement and may not even need to be signed by the defendant to satisfy the requirements of 11 U.S.C. § 523(a)(2)(B).  *See Frankford Bank a/k/a Frankford Trust Co. v. Chryst (In re Chryst)*, 177 B.R. 486, 498 (Bankr. E.D. Pa. 1994).  The financial statements in this case fit the requirement of a written statement in 11 U.S.C. § 523(a)(2)(B).

### B.    Requirement of Material Falsity

In *In re Copeland* the bankruptcy court noted that under 11 U.S.C. § 523(a)(2)(B)(i) "a statement is materially false if it 'contains an important or substantial untruth.  The measuring stick of material falsity is whether the [creditor] would have made the loan if the debtor's true financial condition had been known.'" 291 B.R. at 782 (quoting *First Nat'l Bank v. Sansom (In re Sansom)*, 224 B.R. 49, 54 (Bankr. M.D. Tenn. 1998)).  In addition, courts will also generally consider omissions or concealment regarding assets and liabilities to be material misstatements for purposes of this section.  *In re Copeland*, 291 B.R. at 782 (citing *Sansom*, 224 B.R. at 54).

The term "material" in § 523(a)(2)(B)(i) also contains both objective and subjective components.  *See e.g., Area Community Credit Union v. Tyrrell (In re Tyrrell)*, 363 B.R. 581, 587 (Bankr. D. N.D. 2005).  As the bankruptcy court in *In re Tyrrell* explained:

> Objectively, a statement is materially false if it paints a substantially untruthful picture of a debtor's financial condition by misrepresenting information of the type that would normally affect the decision to grant credit.  The relevant subjective inquiry, although not dispositive, is whether the complaining creditor would have extended credit had it been apprised of the debtor's true situation.

*Id.* (citing *Ramsey Nat'l Bank & Trust Co. v. Dammen (In re Dammen)*, 167 B.R. 545, 550-51 (Bankr. D. N.D. 1994) and *Wallander v. Wallander (In re Wallander)*, 324 B.R. 746, 752 (Bankr. N.D. Iowa 2005)); *see also In re Sharp*, 357 B.R. at 765.  The "size of the discrepancy" is critical in determining whether the inaccuracy is material.  *In re Sharp*, 357 B.R. at 766.  Further, "[a]s a matter of law, material misrepresentation occurs when the amount of unreported liabilities equals at least 35% of asserted net worth."  *First Tennessee Bank Nat'l Assoc. v. Warner (In re*

*Warner)*, 169 B.R. 144, 152 (Bankr. W.D. Tenn. 1994) (citing *Bank One v. Woolum (In re
Woolum)*, 979 F.2d 71 (6th Cir. 1992)).

In this case the court finds that the representation of the Business on the face of the
financial statements coupled with the detail provided on the attachment entitled "Other Assets"
could lead the reader of the financial statement to only one conclusion - that the parties signing
the financial statements owned that business.  Ownership of a corporation is determined by who
owns the stock.  *See e.g., Tunstall v. Tunstall*, No. 1282, 1989 WL 122776, at *6 (Tenn. Ct.
App. Oct. 17, 1989) (noting that "[a] share of stock represents its owner's proportional interest in
a corporation"); 18A Am. Jur. 2d *Corporations* § 630 (2011) (noting that "[w]hen a person
purchases or acquires stock in a corporation, he or she acquires a fractional or proportional
interest in the corporation's capital stock, assets, profits, and liabilities, since each share
represents a distinct and undivided share or interest in the common property of the
corporation").

Although it appears as though the Debtor was able to exercise total control over the
assets of Optimum during the relevant period, the Debtor provided no evidence that she had a
legal right to do so in the event that Ms. Wood or Mr. Konvalinka, as Trustee, decided that she
or he wanted to exercise their rights as the stockholder by either terminating the Debtor or
selling the company.  The stockholders have no fiduciary duty to the officer.  18A Am. Jur. 2d §
613 (2011) (noting that "[o]rdinarily, a stockholder does not stand in any fiduciary relation to the
corporation or its directors"). The failure to list the shares in the stock section is not sufficient to
have put the Bank on notice that the Business was owned by someone else when Business was
addressed separately.  The Debtor represented that she owned the Business.  That was not
true.  The court finds that a misrepresentation was made to the Bank.

The court also finds that the misrepresentation was material.  The equity interest on her
financial statement was not hers and should not have been included in the Debtor's net worth.

As such, her net worth was overstated on each financial statement by 54% to 75% depending

on the year prior to the last renewal prior to her disclosure of the true ownership of the

Business.  The financial statement received before the Optimum note was signed in May of

2007 is the 2/07 Statement.  At that time, the Business represented 75% of the Debtor's net

worth.  Without Optimum the Debtor's net worth changed from $12.5 million to approximately $3

million.  If the Optimum income were to stop, the Debtor's income would have dropped from

almost $2 million to $60,000.

### C.      Representation of Financial Status

Regarding 11 U.S.C. § 523(a)(2)(B)(ii) the bankruptcy court in *In re Copeland* noted that

this section:

> requires that the writing presented to the creditor makes representations
> regarding either the debtor's financial status or an insider's financial status.  Such
> financial-type documents relating to a debtor's financial condition include
> 'balance sheets, income statements, statements of changes in financial position,
> or income and debt statements that provide what may be described as the debtor
> or insider's net worth, overall financial health, or equation of assets and
> liabilities.'

291 B.R. at 783 (quoting *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275

B.R. 606, 615 (Bankr. D. Utah 2002)).  A debtor's tax returns may be considered financial

documents as well.  *In re Copeland*, 291 B.R. at 783.  Again, the financial statements meet the

statute's requirement of a representation of the Debtor's financial status.

### D.      Reasonable Reliance by the Creditor

The third element in 11 U.S.C. § 523(a)(2)(B)(iii) requires "reasonable reliance."  Such

"reasonable reliance" "is determined on a case by case basis, judged in light of the totality of the

circumstances after an examination of all facts and circumstances."  *In re Copeland*, 291 B.R. at

784.  A court should review whether the reliance was objectively reasonable and whether actual

reliance occurred.  *In re Tyrrell*, 363 B.R. at 588.  One bankruptcy court has phrased the

question as follows: "did the creditor exercise the degree of care which would be exercised by a

reasonably cautious person in the same business transaction under similar circumstances?"

*Midwest Comm. Fed. Credit Union v. Sharp (In re Sharp)*, 357 B.R. 760, 766 (Bankr. N.D. Ohio

2007).  Courts may consider several factors when determining "reasonable reliance," including:

> (a) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust;
> (b) whether there were any 'red flags' that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and
> (c) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*In re Copeland*, 291 B.R. at 785 (quoting *Coston v. Bank of Malvern (In re Coston)*, 991 F.2d

257, 261 (5th Cir. 1993)); *see also BancBoston Mortgage Corp. v. Ledford (In re Ledford)*, 970

F.2d 1556, 1560 (6th Cir. 1992).  Other factors include whether "the creditor had a close

personal relationship or friendship with the debtor" and "whether the debt was incurred for

personal or commercial reasons."  *First Tennessee Bank Nat'l Assoc. v. Warner (In re Warner)*,

169 B.R. 144, 153 (Bankr. W.D. Tenn. 1994) (citing *In re Ledford*, 970 F.2d at 1560).

In this case, Mr. Stewart testified that the Bank specifically relied on the financial

statements and the large net worth of the Debtor in its decision to grant or renew each of the

four loans.  Although the Bank provided documentary evidence of the credit approval for only

one of the four loans, the Optimum Loan, Mr. Stewart's testimony was clear that the reliance

extended to all four loans. The Debtor did not dispute that the Bank relied on the Financial

Statements in making all four loans. Trial Exhibits 22, 23, and 24.  Facts which support the

reasonableness of the Bank's reliance are that the Debtor and her former husband had a

relationship with this Bank prior to Optimum and had provided a financial statement which

accurately reflected ownership of ASK.  When the financials reflected the ownership of Optimum

in the same way, the Bank had a track record on which to rely.  Over the course of the

relationship, the Bank also factored Optimum's accounts on another credit facility.  The Bank

saw all of the operations of the company, and no evidence was introduced that the Bank had

any other bad experiences with the Debtor or Optimum that would have resulted in the Bank no longer trusting the representations of these customers.  The first problems began with the divorce of the parties in 2007 and the claims made by AIG which resulted in the letter of credit being called on May 25, 2008.  By that time, the proceeds of all four loans had been disbursed to the Debtor.

Despite the relationship of the parties and lack of any "red flags," the court is troubled by the lack of independent verification on a large commercial loan.  The only evidence that the Bank proffered to demonstrate its standard of due diligence was the requirement of a guaranty. Mr. Ledbetter testified that it was the Bank's practice to check on the corporate status of the borrowers, but he did not know whether it had been done in this case.  Trial Testimony of Steve Ledbetter, April 6, 2011 at 4:04 - 4:05 p.m.  Ms. Ellis testified that she had conducted a secretary of state search and confirmed the corporate existence of Optimum.   Trial Testimony of Gayle Ellis, April 6, 2011 at 3:52 - 3:54 p.m.  Ms. Hart testified that she was never asked for a stock pledge or any other corporate documents.  Trial Testimony of Loretta Hart, April 6, 2011 at 3:06 p.m.  However, it does appear that the Bank did review the financial statements.  Although the tax returns were received after the loan was renewed in 2006, the Bank did substantiate the income numbers included on the financial statements.  April 4, 2007 Letter from Cynthia Martin, Exhibit 19; 2006 Tax Return, Trial Exhibit 12 at 1.

The Bank also offered as evidence the credit approval form for the renewal of the Optimum Loan dated March 9, 2007.  Trial Exhibit 22 at 1.  The credit renewal states that the Bank examined the 2/07 Statement and notes the personal net worth less the Business is $3,034,577.  *Id.*  The Bank also noted the income earned by Mr. Scheib and Ms. Hart which was supported by the parties' W-2s which were supplied to the Bank.

One bankruptcy court in this Circuit, quoting another bankruptcy court, explained the tensions present in the "reasonable reliance" provision of § 523(a)(2)(B)(iii):

Page 15

Whether or not reliance was reasonable is a *factually sensitive inquiry* . . . . The inquiry can involve such things as the amount and adequacy of the information given or requested, the nature and circumstances of the loan, the past relationship, if any, between creditor and debtor, the amount of the loan itself, the sophistication of the lender, its normal lending practices and the custom of the industry.

The court is keenly aware of the tensions that exist within Section 523(a)(2)(B). Its requirement of reasonable reliance must not become a vehicle by which the courts, having the benefit of 20/20 hindsight, second guess a creditor's loan policies or the wisdom of its lending decisions. At the same time, however, "it is not our business to bail out any lender no matter how recklessly it gives out its money."

*In re Warner*, 169 B.R. at 153 (quoting *Marx v. Reeds (In re Reeds)*, 145 B.R. 703, 707 (Bankr. N.D. Okl. 1992)) (emphasis in original). As the Sixth Circuit has held, "[o]nce it has been established that a debtor has furnished a lender a materially false financial statement, the reasonableness requirement of § 523(a)(2)(B) 'cannot be said to be a rigorous requirement, but rather is directed at creditors acting in bad faith.'" *In re Woolum*, 979 F.2d at 76 (quoting *Martin v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1166 (6th Cir. 1985) (abrogated on other grounds by *Grogan v. Garner*, 498 U.S. 279)).

The Debtor argues that the Plaintiff's reliance on only the financial statements was unreasonable. The Debtor testified that the creditor should have known of her interest in Optimum based on the personal tax returns that she provided the Bank. No return reflecting the ownership interest was provided to the Bank prior to the last renewal of any of the loans. All four bank employees testified that they did not know of Ms. Wood's ownership until the 2007 Tax Return arrived at the bank on November 20, 2008. The Debtor contends that she explained the trust ownership of Optimum to the Bank when she met with them after her divorce when questioned about what ownership Mr. Scheib had in Optimum. She testified that Mr. Stewart indicated to her that it was a good thing that she had kept it out of his name. Even if the court were to accept her statement as true in light of the testimony of Mr. Ledbetter and Mr. Stewart that they did not have such a discussion with her, that discussion would have taken place well

after the money was loaned and the Optimum renewal of 2006 done.

The Debtor offered no expert testimony to indicate that the Bank's practice under the circumstances was below industry standards for due diligence for a loan of this size. There was no evidence of bad faith in making or renewing the loans.  The Debtor's argument that the Bank should have learned of the ownership by asking for a stock pledge or requiring a negative pledge is rejected.  Adopting such a requirement would in essence be the court "having the benefit of 20/20 hindsight, second [guessing] a creditor's loan policies or the wisdom of its lending decisions."  *In re Warner*, 169 B.R. at 153.  *See also*, *In re Woolum*, 979 F. 2d at 76 ("A district court reviewing a bankruptcy court's determination of reasonable reliance is not 'to undertake a subjective evaluation and judgment of a creditor's lending policy and practices.'")

Applying these standards to the facts in this case, the court finds the Bank's reliance was reasonable.

### E.    Publish with Intent to Deceive

With respect to the fourth element of a Section 523(a)(2)(B) claim, the bankruptcy court in *In re Copeland* explained:

> Subsection (B)(iv) has two integral parts, first, that the debtor created the false statements, had the statements created, or allowed the statements to be "published," and second, that the debtor intended to deceive by producing the statements.  "Publish" is defined as "[t]o make public; to circulate; to make known to people in general. To issue; to put into circulation . . . . To declare or assert, directly or indirectly, by words or actions, that a forged instrument is genuine." The debtor may supply the creditor with the statements directly, or the creditor may obtain them indirectly from another source.
> As with § 523(a)(2)(A), intent to deceive is a subjective measure that can be proved by a debtor's actions. . . .

291 B.R. at 785-86 (quoting Black's Law Dictionary 1233 (6th ed. 1994) and citing 4 Collier on Bankruptcy ¶ 523.08[1][e][i] (Lawrence P. King ed., 15th ed. rev. 2002); *Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert)*, 141 F.3d 277, 281 (6th Cir. 1998)) (other citations omitted).

A plaintiff may demonstrate an intent to deceive by demonstrating "actual fraud" through

the use of circumstantial evidence. *In re Sharp*, 357 B.R. at 767. However, pursuant to §

523(a)(2)(B), "a finding that a debtor had the specific intent to deceive is not absolutely

necessary to sustain a finding of fraud." *Id.* at 769. Instead, a determination that the debtor

acted with "gross recklessness" may suffice to satisfy the intent requirement. *Id.* (citing *Martin*

*v. Bank of Germantown (In re Martin)*, 761 F.2d 1163, 1167 (6th Cir. 1985)). *See also, Knoxville*

*Teachers Credit Union v. Parkey*, 790 F.2d 490, 492 (6th Cir. 1986). Moreover, "mere

unsupported assertions of honest intent will not overcome natural inferences derived from

admitted facts." *Rosen's, Inc. v. Ghere (In re Ghere)*, 393 B.R. 209, 215 (Bankr. W.D. Mo.

2008) (citing *Agribank v. Webb (In re Webb)*, 256 B.R. 292, 297 (Bankr. E.D. Ark. 2000)).

Courts can review certain "badges of fraud" when assessing the intent to deceive,

including whether the other elements of § 523(a)(2)(B) have been demonstrated. *In re Sharp*,

357 B.R. at 767. In the context of intent to deceive with respect to a § 727 claim, this court

recognized the following "badges of fraud" that might be applicable in a § 523(a)(2)(B) situation:

> . . . (ii) the family, friendship, or close relationship between the parties; . . . (iv) the
> financial condition of the party sought to be charged prior to and after the
> transaction in question; . . . (vii) the existence or cumulative effect of a pattern or
> series of transaction[s] or course of conduct after incurring of debt, onset of
> financial difficulties, or pendency or threat of suit by creditors; and (viii) the
> general chronology of events and transactions under inquiry.

*Jahn v. Flemings (In re Flemings)*, 433 B.R. 230, 236 (Bankr. E.D. Tenn. 2010) (quoting *Gordon*

*v. Courtney (In re Courtney)*, 351 B.R. 491, 500 (Bankr. E.D. Tenn. 2006)).

The Debtor testified that she had no intent to deceive the Bank. She stated that she

believed that she controlled the assets and knew that her niece Ms. Wood would not interfere.

At another point she testified that she had structured the ownership so her niece would have the

business after she was gone. Despite these contentions that the Debtor believes mitigates her

intent to deceive, the court notes that Ms. Wood did not appear to testify, despite being listed as

Page 18

a witness.  Mr. Konvalinka, the trustee, also did not appear, although being listed.  No trust

document was provided that would have substantiated her claim that in her case, her control

was just as good as stock ownership.  Even if her motivation to have someone else own the

stock was to keep the ownership away from her former husband, her failure to disclose that fact

to the Bank so it could make an informed decision about making and renewing the loans was

grossly reckless if not intended to defraud the Bank.  Her claim that she provided the Plaintiff

with a copy of her personal tax return accurately showing the ownership is "too little, too late" to

overcome the fact that she had for several years led the Bank to believe she and her former

husband owned Optimum.  The court finds that the Debtor intended to deceive the Bank.

###### IV.    Conclusion

Based on the evidence and testimony presented at trial, and the court's review of the

applicable law as outlined *supra*, the court concludes that the Debtor's debt owed to the Bank is

nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).  The Bank has fulfilled its burden of

proof to demonstrate the elements of its § 523(a)(2)(B) claim by a preponderance of the

evidence.  The court holds that the following debts are nondischargeable pursuant to 11 U.S.C.

§ 523(a)(2)(B):

1.    The Defendant's debt owed to the Bank on the guaranty of the Optimum Loan in the

amount of $953,375.96.  To the extent that any portion of the debt owed to the Bank is

based on the Debtor's guaranty of the obligations of Optimum, this court's determination

is without prejudice to any counterclaims or offsets alleged by Optimum in other litigation

that may ultimately reduce the amount owed by Defendant pursuant to her guaranty of

the obligations of Optimum.

2.    The Defendant's debt on the Personal Loan in the amount of $12,765.66.

3.    The Defendant's debt on the Daisy Loan in the amount of $177,208.

4.    The Defendant's debt on the Residence Loan in the amount of $145,151.33.

A separate order will enter.

# # #